**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VLADIMIR GUSINSKY REVOCABLE TRUST, Derivatively on Behalf of FOOT LOCKER, INC., | Case No. |
| Plaintiff, | VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT |
| v. | |
| RICHARD A. JOHNSON, LAUREN B. PETERS, DONA D. YOUNG, JAROBIN GILBERT, JR., CHERYL NIDO TURPIN, ALAN D. FELDMAN, MATTHEW M. MCKENNA, GUILLERMO G. MARMOL, MAXINE CLARK, STEVEN OAKLAND, ULICE PAYNE, JR., KIMBERLY K. UNDERHILL, and NICHOLAS DIPAOLO, | |
| Defendants, | |
| -and- | |
| FOOT LOCKER, INC., a New York Corporation, | |
| Nominal Defendant. | DEMAND FOR JURY TRIAL |

Plaintiff, by its attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.    This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Foot Locker, Inc. ("Foot Locker" or the "Company") against certain of its officers and

directors for breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of law. These wrongs resulted in billions of dollars in damages to Foot Locker's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed the Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.     Foot Locker is a global retailer that offers athletically inspired shoes and apparel primarily through its more than three thousand stores. The Company's brick-and-mortar retail stores[1] are principally mall-based in the United States, Canada, Europe, Australia, and New Zealand, although the Company also targets high-traffic urban retail areas and streets. The Company's athletic footwear and apparel operations compete primarily with athletic retailers such as footwear specialty stores, sporting goods stores, department stores, traditional shoe stores, and mass merchandisers. In recent years, however, Foot Locker has faced mounting headwinds from competing online retailers such as Amazon.com, Inc. ("Amazon").

3.     Foot Locker's dependence and attachment to malls has left the Company vulnerable to market share loss. An article in *Business Insider* recently detailed that "[a]s mall traffic has declined, Foot Locker and other mall-centric brands have struggled to keep locations open, especially as anchors like Sears and Macy's have shuttered locations." Brands normally associated with the Company like Nike and Adidas are now more widely available on e-commerce websites.

---

[1] The term "brick-and-mortar" refers to a traditional physical retail business requiring possession or leasing of space to sell its products face-to-face to customers. Publicly-traded retailers with brick-and-mortar stores report in their SEC filings on a per-store basis, reporting comparable store sales.

4. Company fiduciaries were or should have been monitoring the risks associated with customers' migration to online sources to shop for athletic apparel. An analyst from UBS, Michael Binetti, would later comment that the Company is "almost certain" to lose market share to online retailers in the changing climate of customer choice. Instead of providing a forthright assessment regarding the effect of rising competition, the Individual Defendants (as defined herein) caused or allowed repeated false and misleading public statements that concealed material, adverse information regarding operational issues related to Foot Locker's ability to keep the doors of its brick-and-mortar retail stores open and profitable.

5. Particularly, beginning in at least August 2016, Foot Locker's fiduciaries represented in the Company's public filings, press releases, and conference calls with analysts and investors that Foot Locker was "planning for a mid-single digit comparable sales gain and a double-digit earnings per share increase for the full year of 2017." The Individual Defendants misleadingly provided the impression that the Company's "outstanding track record of meaningful sales and profit growth over several years is a strong testament to [its] solid position at the center of sneaker culture," which the Individual Defendants attributed to the increasing of its retail store portfolio.

6. By omitting or misrepresenting this information and touting Foot Locker's operational strength and future growth, the Individual Defendants artificially kept the Company's financials aloft throughout the relevant period. The truth of Foot Locker's financial well-being slowly came to light in a May 19, 2017 earnings press release, when the Company revealed that its profits had fallen to $180 million, well below the $191 million investors were led to expect for the first quarter of 2017. During the earnings conference call in the shadow of this announcement, Company executives informed analysts and investors that the profit and

comparable store sales stagnation would continue through the second quarter of 2017. To make the Company's financial guidance of a mid-single-digit earnings per share ("EPS") increase, these defendants admitted that inventory and other costs could be cut. After the disclosure of the drastic shortfall in profits, Foot Locker's stock plunged more than 16%, a loss of almost $1.54 billion in market capitalization in a single day.

7.    To make matters worse, by August 18, 2017, the Company was forced to finally reveal it was closing approximately 130 brick-and-mortar retail stores, or 100 more stores than it had previously announced. This announcement came in the wake of weaker-than-expected sales for the second quarter of 2017, with comparable store sales slipping as much as 6%. Weaker sales would continue for the remainder of the fiscal year, with comparable store sales down between 3% and 4% for at least the next two quarters. Revenues had declined 4.4% year-over-year, from $1.78 billion in the second quarter of 2016 to $1.7 billion in the second quarter of 2017. While the Company had led investors to expect profits of $0.90 per share for the second quarter, the Company reported a mere $0.39 per share in profits, or $51 million. This was drastically below the $127 million in profits earned in the same quarter of 2016.

8.    The exposure of the Individual Defendants' wrongful acts and omissions, and their prior false and misleading statements regarding the Company's business practices, operations, financials, and financial prospects, caused the Company to suffer significant damages and harm. Upon disclosing the dramatic sales drop-off for the second quarter and the future sales slump, the Company's stock price plummeted nearly 28% on August 18, 2017, or a loss of $1.74 billion in market capitalization in a single day. Overall, Foot Locker's stock price has fallen from an artificially inflated $79.20 per share on December 8, 2016, to $34.38 per share on

August 18, 2017.  Market capitalization sunk $5.96 billion in little over eight months, a loss of over half the Company's value.

9.      In the midst of this wrongdoing, defendants Richard A. Johnson ("Johnson"), Maxine Clark ("Clark"), Alan D. Feldman ("Feldman"), Jarobin Gilbert, Jr. ("Gilbert"), Guillermo G. Marmol ("Marmol"), Matthew M. McKenna ("McKenna"), Steven Oakland ("Oakland"), Ulice Payne, Jr. ("Payne"), Cheryl Nido Turpin ("Turpin"), Kimberly K. Underhill ("Underhill"), and Dona D. Young ("Young") negligently made false and misleading statements in the Company's April 7, 2017 Proxy Statement on Form DEF 14A filed with the SEC (the "2017 Proxy").  The 2017 Proxy was filed ahead of the Company's Annual Meeting of Shareholders held May 17, 2017.  The 2017 Proxy included votes on the election of Foot Locker's eleven-member Board of Directors (the "Board"), including defendants Johnson, Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young, as well as a stockholder vote for approval of an amendment of the Annual Incentive Compensation Plan (the "Incentive Plan") to increase the maximum bonus payout to certain executives including defendant Johnson for any plan year from $3 million to $6 million.  In connection with these efforts, the above members of the Board misleadingly stated that they engaged in operational risk oversight and that the Audit Committee of the Board exercises oversight of the Company's financial statements.

10.      Further, as a direct result of this unlawful course of conduct, the Company is now the subject of federal securities class action lawsuits filed in the U.S. District Court for the Eastern District of New York on behalf of investors who purchased Foot Locker's shares.

11.    Thus, plaintiff rightfully brings this action derivatively on behalf of Foot Locker to vindicate the Company's rights against the Individual Defendants named herein, and to hold them responsible for the damages that they, as wayward fiduciaries, have caused the Company.

## JURISDICTION AND VENUE

12.    Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

13.    This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

14.    Venue is proper under 28 U.S.C. §1391 because Foot Locker maintains offices within this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

15.    Plaintiff Vladimir Gusinsky Revocable Trust was a stockholder of Foot Locker at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Foot Locker stockholder.

**Nominal Defendant**

16.     Nominal defendant Foot Locker is a New York corporation with principal executive offices located at 330 West 34th Street, New York, New York.  Foot Locker is a global retailer of athletic shoes and apparel.  As of February 3, 2018, the Company operated 3,310 stores in the United States, Canada, Europe, Australia, and New Zealand and had 15,141 full-time and 34,068 part-time employees.

**Defendants**

17.     Defendant Johnson is Foot Locker's Chief Executive Officer ("CEO"), President and a director and has been since December 2014 and Chairman of the Board and has been since May 2016.  Defendant Johnson was also Foot Locker's Executive Vice President and Chief Operating Officer from May 2012 to November 2014; Executive Vice President and Group President–Retail Stores from July 2011 to May 2012; President and CEO of Foot Locker U.S., Lady Foot Locker, Kids Foot Locker, and Footaction from January 2010 to June 2011; President and CEO of Foot Locker Europe from August 2007 to January 2010; and President and CEO of Footlocker.com/Eastbay from April 2003 to August 2007.  Defendant Johnson is named as a defendant in related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Johnson knowingly, recklessly, or with gross negligence: (i) caused or allowed Foot Locker to disseminate improper statements concerning the Company's business, operations, and prospects; and (ii) failed to maintain adequate disclosure controls and procedures with respect to Foot Locker's operations and financial standing.  Defendant Johnson also negligently made materially misleading statements in the Company's 2017 Proxy.  Foot Locker paid defendant Johnson the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compen-sation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compen-sation | Total |
|---|---|---|---|---|---|---|---|
| 2017 | $1,100,000 | $2,750,061 | $2,200,005 | | $294,161 | $48,995 | $6,393,222 |
| 2016 | $1,087,500 | $2,062,522 | $2,200,016 | $2,599,932 | $403,443 | $572,455 | $8,925,868 |

18.     Defendant Lauren B. Peters ("Peters") is Foot Locker's Executive Vice President and Chief Financial Officer ("CFO") and has been since July 2011.  Defendant Peters was also Foot Locker's Senior Vice President–Strategic Planning from April 2002 to June 2011 and Vice President–Planning from January 2000 to April 2002.  Defendant Peters is named as a defendant in related securities class action complaints that allege she violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Peters knowingly, recklessly, or with gross negligence: (i) caused or allowed Foot Locker to disseminate improper statements concerning the Company's business, operations, and prospects; and (ii) failed to maintain adequate disclosure controls and procedures with respect to Foot Locker's operations and financial standing.  Foot Locker paid defendant Peters the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compen-sation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compen-sation | Total |
|---|---|---|---|---|---|---|---|
| 2017 | $675,000 | $506,314 | $500,009 | | $174,281 | $7,646 | $1,863,250 |
| 2016 | $657,500 | $1,579,759 | $450,010 | $714,088 | $205,626 | $84,011 | $3,690,994 |

19.     Defendant Young is Foot Locker's Independent Lead Director and has been since May 2016 and a director and has been since January 2001.  Defendant Young is also a member of Foot Locker's Audit Committee and has been since at least April 2018.  Defendant Young knowingly or recklessly: (i) caused or allowed Foot Locker to disseminate improper statements

concerning the Company's business, operations, and prospects; and (ii) failed to maintain adequate disclosure controls and procedures with respect to Foot Locker's operations and financial standing. Defendant Young also negligently made materially misleading statements in the Company's 2017 Proxy. Foot Locker paid defendant Young the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $141,088 | $224,271 | $365,359 |
| 2016 | $126,712 | $207,407 | $334,119 |

20.    Defendant Gilbert is a Foot Locker director and has been since 1981. Defendant Gilbert is also a member of Foot Locker's Audit Committee and has been since at least April 2016. Defendant Gilbert knowingly or recklessly: (i) caused or allowed Foot Locker to disseminate improper statements concerning the Company's business, operations, and prospects; and (ii) failed to maintain adequate disclosure controls and procedures with respect to Foot Locker's operations and financial standing. Defendant Gilbert also negligently made materially misleading statements in the Company's 2017 Proxy. Foot Locker paid defendant Gilbert the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $104,189 | $139,988 | $244,177 |
| 2016 | $103,462 | $129,957 | $233,419 |

21.    Defendant Turpin is a Foot Locker director and has been since January 2001. Defendant Turpin knowingly or recklessly: (i) caused or allowed Foot Locker to disseminate improper statements concerning the Company's business, operations, and prospects; and (ii) failed to maintain adequate disclosure controls and procedures with respect to Foot Locker's operations and financial standing. Defendant Turpin also negligently made materially

misleading statements in the Company's 2017 Proxy.  Foot Locker paid defendant Turpin the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $96,190 | $193,600 | $289,790 |
| 2016 | $83,712 | $176,605 | $260,317 |

22.    Defendant Feldman is a Foot Locker director and has been since February 2005. Defendant Feldman is also a member of Foot Locker's Finance and Strategic Planning Committee and has been since at least April 2016.  Defendant Feldman knowingly or recklessly: (i) caused or allowed Foot Locker to disseminate improper statements concerning the Company's business, operations, and prospects; and (ii) failed to maintain adequate disclosure controls and procedures with respect to Foot Locker's operations and financial standing.  Defendant Feldman also negligently made materially misleading statements in the Company's 2017 Proxy.  Foot Locker paid defendant Feldman the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $105,630 | $185,965 | $291,595 |
| 2016 | $103,954 | $171,579 | $275,533 |

23.    Defendant McKenna is a Foot Locker director and has been since May 2006. Defendant McKenna is also Chairman of Foot Locker's Finance and Strategic Planning Committee and a member of the Audit Committee and has been since at least April 2016. Defendant McKenna knowingly or recklessly: (i) caused or allowed Foot Locker to disseminate improper statements concerning the Company's business, operations, and prospects; and (ii) failed to maintain adequate disclosure controls and procedures with respect to Foot Locker's operations and financial standing.   Defendant McKenna also negligently made materially misleading statements in the Company's 2017 Proxy.  Foot Locker paid defendant McKenna the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $109,074 | $147,478 | $256,552 |
| 2016 | $108,942 | $137,473 | $246,415 |

24.     Defendant Marmol is a Foot Locker director and has been since February 2011. Defendant Marmol is also Chairman of Foot Locker's Audit Committee and a member of the Finance and Strategic Planning Committee and has been since at least April 2016.  Defendant Marmol knowingly or recklessly: (i) caused or allowed Foot Locker to disseminate improper statements concerning the Company's business, operations, and prospects; and (ii) failed to maintain adequate disclosure controls and procedures with respect to Foot Locker's operations and financial standing.    Defendant Marmol also negligently made materially misleading statements in the Company's 2017 Proxy.  Foot Locker paid defendant Marmol the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $113,630 | $152,505 | $266,135 |
| 2016 | $113,954 | $142,465 | $256,419 |

25.     Defendant Clark is a Foot Locker director and has been since February 2013. Defendant Clark is also a member of Foot Locker's Finance and Strategic Planning Committee and has been since at least April 2016.  Defendant Clark was a member of Foot Locker's Audit Committee from at least April 2016 to at least April 2017.  Defendant Clark knowingly or recklessly: (i) caused or allowed Foot Locker to disseminate improper statements concerning the Company's business, operations, and prospects; and (ii) failed to maintain adequate disclosure controls and procedures with respect to Foot Locker's operations and financial standing. Defendant Clark also negligently made materially misleading statements in the Company's 2017 Proxy.  Foot Locker paid defendant Clark the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $98,189 | $139,988 | $238,177 |
| 2016 | $101,462 | $129,957 | $231,419 |

26.     Defendant Oakland is a Foot Locker director and has been since February 2014. Defendant Oakland knowingly or recklessly: (i) caused or allowed Foot Locker to disseminate improper statements concerning the Company's business, operations, and prospects; and (ii) failed to maintain adequate disclosure controls and procedures with respect to Foot Locker's operations and financial standing.   Defendant Oakland also negligently made materially misleading statements in the Company's 2017 Proxy.  Foot Locker paid defendant Oakland the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $65,569 | $188,084 | $253,653 |
| 2016 | $61,535 | $164,118 | $225,653 |

27.     Defendant Payne is a Foot Locker director and has been since December 2016. Defendant Payne is also a member of Foot Locker's Audit Committee and has been since at least April 2017.  Defendant Payne knowingly or recklessly: (i) caused or allowed Foot Locker to disseminate improper statements concerning the Company's business, operations, and prospects; and (ii) failed to maintain adequate disclosure controls and procedures with respect to Foot Locker's operations and financial standing.  Defendant Payne also negligently made materially misleading statements in the Company's 2017 Proxy.  Foot Locker paid defendant Payne the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $102,190 | $139,988 | $242,178 |

28.     Defendant Underhill is a Foot Locker director and has been since December 2016. Defendant Underhill is also a member of Foot Locker's Finance and Strategic Planning

Committee and has been since at least April 2017. Defendant Underhill knowingly or recklessly: (i) caused or allowed Foot Locker to disseminate improper statements concerning the Company's business, operations, and prospects; and (ii) failed to maintain adequate disclosure controls and procedures with respect to Foot Locker's operations and financial standing. Defendant Underhill also negligently made materially misleading statements in the Company's 2017 Proxy. Foot Locker paid defendant Underhill the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $92,189 | $139,988 | $232,177 |

29.     Defendant Nicholas DiPaolo ("DiPaolo") was a Foot Locker director from January 2002 to May 2017; Chairman of the Board from May 2015 to May 2016; and Independent Lead Director from May 2012 to May 2015. Defendant DiPaolo was also a member of Foot Locker's Finance and Strategic Planning Committee from at least April 2016 to at least April 2017. Defendant DiPaolo knowingly or recklessly: (i) caused or allowed Foot Locker to disseminate improper statements concerning the Company's business, operations, and prospects; and (ii) failed to maintain adequate disclosure controls and procedures with respect to Foot Locker's operations and financial standing. Foot Locker paid defendant DiPaolo the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $39,375 | $29,124 | $68,499 |
| 2016 | $143,546 | $129,957 | $273,503 |

30.     The defendants identified in ¶¶17-18 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶17, 19-29 are referred to herein as the "Director Defendants." The defendants identified in ¶¶19-20, 23-25, 27 are referred to herein as the "Audit Committee Defendants." The defendants identified in ¶¶22-25, 28-29 are referred to herein as

the "Finance and Strategic Planning Committee Defendants." Collectively, the defendants identified in ¶¶17-29 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

31.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Foot Locker and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Foot Locker in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Foot Locker and not in furtherance of their personal interest or benefit.

32.    Each director and officer of the Company owed, and owes, to Foot Locker, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

33.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Foot Locker, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Foot Locker, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly-held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls, so that the market price of the Company's stock would be based on truthful and accurate information.

34.     To discharge their duties, the officers and directors of Foot Locker were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Foot Locker were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority, and disseminating truthful and accurate statements to the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(c)     remain informed as to how Foot Locker conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Additional Duties of the Audit Committee Defendants**

35.     In addition to these duties, the Audit Committee Defendants owed specific duties to Foot Locker under the Audit Committee's Charter.  According to the Charter, the purpose of the Audit Committee is to "assist the Board in fulfilling its oversight of (i) the integrity of the Company's financial statements, (ii) accounting policies and practices, (iii) the Company's compliance with legal and regulatory requirements, ... and (vi) the Company's risk management program, including its policies and practices regarding risk assessment and risk management...."

36.    Moreover, the Audit Committee is charged with "preparing the Company's financial statements" and ensuring that "the Company's financial statements and disclosures are complete and accurate." In exercising these duties, the Committee must review and discuss with management and the independent auditors the Company's Forms 10-K and 10-Q, including "any issues that arose concerning the completeness or accuracy of the financial statements, and management's response."

37.    In terms of risk management, the Audit Committee must "[r]eview and discuss with management policies with respect to risk assessment and risk management, the Company's major financial and operational risk exposures, and the steps management has taken to monitor, mitigate, and control these exposures." The Audit Committee is required to "periodically report to the Board of Directors with regard to these discussions."

**Additional Duties of the Finance and Strategic Planning Committee Defendants**

38.    Under the Finance and Strategic Planning Committee Charter, the Finance and Strategic Planning Committee Defendants owed a duty to "review the overall strategic and financial plans of the Company, including capital expenditure plans" and "review acquisition and divestiture proposals."

39.    In terms of overseeing the Company's financial and strategic plans, the Finance and Strategic Planning Committee Defendants are charged with reviewing "the Company's financial plans and objectives," as well as reviewing and making "recommendations to the Board of Directors with regard to the Company's annual operating budget and three-year plans." The Finance and Strategic Planning Committee is further charged with periodically reviewing the Company's uses of cash, including capital expenditures and, if appropriate, make recommendations to the Board with respect thereto. To accomplish its duties, the Finance and

Strategic Planning Committee has access to the members of Foot Locker's senior management "necessary or desirable to carry out the Committee's work."

**Breaches of Duties**

40.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its stockholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Foot Locker, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

41.    The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in making improper statements to the public and Foot Locker's stockholders, improper practices that wasted the Company's assets, and caused Foot Locker to incur substantial damage.

42.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Foot Locker, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage Foot Locker has already incurred, the Company has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

43.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

44.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) conceal harmful information relating to Foot Locker's business practices, operations, financials, financial prospects, and lack of disclosure controls and procedures that rendered statements in the Company's SEC filings and public announcements improper; (ii) deceive the investing public, including stockholders of Foot Locker, regarding the Individual Defendants' management of Foot Locker's operations; and (iii) enhance the Individual Defendants' executive and directorial positions at Foot Locker and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

45.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused Foot Locker to issue improper financial statements.

46.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust

enrichment; and to conceal adverse information concerning Foot Locker's operations, financial condition, and future business prospects.

47.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing Foot Locker to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

48.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**BACKGROUND**

49.     Foot Locker is global retailer of athletic shoes and apparel, with 3,310 primarily mall-based stores and stores in high-traffic urban retail areas and streets as of February 3, 2018. The Company has brick-and-mortar stores in the United States, Canada, Europe, Australia, and New Zealand.  The Company operates under several brand names, including Foot Locker, Champs Sports, Kids Foot Locker, Footaction, SIX:02, Lady Foot Locker, Runners Point, and Sidestep.  To a lesser extent, the Company also provides a direct-to-customer business offering athletic footwear, apparel, and equipment through its online, mobile, and catalog channels, which include Footlocker.com and Eastbay.  The Company's brick-and-mortar retail stores, however,

- 19 -

provided over 85% of its total sales for the fiscal year 2017, making retail Foot Locker's largest segment by a wide margin.

50.    The retail business, of which Foot Locker is a part, has struggled to maintain ground in recent years. As a March 2, 2018 article titled "Foot Locker Is Closing 110 Stores as the Retail Apocalypse Rages on" published by *Business Insider* pointed out, "[a]s mall traffic has declined, Foot Locker and other mall-centric brands have struggled to keep locations open, especially as anchors like Sears and Macy's have shuttered locations."

51.    Meanwhile, consumers have raced to online competitors like Amazon to buy the athletic wear brands they would have normally purchased in the box retailer stores. *Business Insider* article author Kate Taylor stated that "[a]t the same time, e-commerce traffic has exploded, allowing customers to buy brands like Nike directly from the company or from online competitors."

52.    In this environment, Foot Locker's market share loss is inevitable. The *Wall Street Journal* would later report in August 2017 in an article titled "Foot Locker Follows Other Sportswear Retailers in Reporting Weaker-than-Expected Sales" that "major vendors are looking to expand their sales to big-box retailers as well as online, efforts that pose a threat to traditional chains like Foot Locker."

## **IMPROPER STATEMENTS**

53.    Beginning in August 2016, the Individual Defendants made repeated improper statements about Foot Locker's understanding of its core customers, touting its ability to "deliver the trend-right, premium footwear and apparel assortments our customers seek." In connection with this supposed grasp of market trends, the Individual Defendants claimed that it has had "consistently outstanding financial results" and "current strong financial position" that implied

continued growth.  In truth, the Company's market share has been falling off requiring it to close brick-and-mortar retail stores across the U.S. in the face of ever-increasing online retail competition that out-price Foot Locker.  In the Company's filings with the SEC and public announcements, the Individual Defendants omitted or misrepresented material information regarding the loss of vendors and customers to these online retailers and the closing of retail stores.

54.    On August 19, 2016, Foot Locker issued a press release, reporting the Company's financial and operating results for the second quarter ended July 30, 2016 (the "Q2 2016 Press Release").  For the second quarter of 2016, Foot Locker reported net income of $127 million, or $0.94 per share, compared with net income of $119 million, or $0.84 per share, for the same quarter in 2015.  Second quarter comparable-store sales increased 4.7%.  Total sales increased 5%, to $1.8 billion in 2016, compared with sales of $1.7 billion for the corresponding prior-year period.  EPS increased 12% to $0.94 per share over the quarter.  Discussing these financial results, Foot Locker's CEO and Chairman defendant Johnson claimed that the Company had a "deep understanding of the core customer" and their habits, stating:

> As a Company, Foot Locker has strong leadership positions in the athletic industry, with the most important being our deep understanding of the core customer for each of our banners.
>
> * * *
>
> We share this understanding with our key vendors, which enables us to partner with them to deliver the trend-right, premium footwear and apparel assortments our customers seek, which in turn has led to consistently outstanding financial results such as we announced today.  Within the second quarter, we drove comparable sales gains across basketball, running, and classic footwear, as well as apparel.  We also posted gains in all regions and channels in which we operate, reflecting the success of our strategic initiatives to build our Company to be an enduring retail leader with strengths across many dimensions.

55.    In the Q2 2016 Press Release, Executive Vice President and CFO defendant Peters claimed that Foot Locker was making "substantial and thoughtful investments in its stores, digital sites, and infrastructure over the years, which have led to significantly improved productivity."    She further asserted that the Company was in a "strong financial position," stating:

> The returns from those investments, combined with careful inventory and expense management, have led to our current strong financial position.  This position of strength underpins our commitment to balance our allocation of capital between additional investments in the business and returning substantial amounts of cash to shareholders through our dividend and share repurchase programs, as evidenced by the $350 million of cash we have returned to shareholders in the first half of 2016.

56.    That same day, on August 19, 2016, Foot Locker held an earnings conference call for analysts and investors.  During the conference call, Company fiduciaries issued statements on behalf of the Company regarding its financial and operational prospects, including supposed increased foot traffic in retail stores.  Defendant Johnson stated:

> The investments we have made in our store fleet, both in the physical appearance of the stores, and the quality of the merchandise assortments, have led to our stores being destinations for our customers.  This can be seen in our traffic results, which consistently outpace overall mall or high street traffic.  Our traffic was up in the US this quarter....

> Being a strong retail destination positions us as a leading partner with our landlords in the malls, and increasingly on the prime shopping streets across our global footprint.  And our most important investments have been in our people, leading us to have, in my opinion, the best talents in retail, including our associates in our stores, in the field, and in all of our support facilities.  This powerful combination enabled us to build strong leadership positions across the athletic retail industry.

57.    In response to a question from an analyst during the conference call about the loss of anchor stores in malls and its effect on retail traffic, defendant Johnson maintained that traffic remained up for the fiscal quarter, stating:

Our US traffic was up in the quarter, Matt, and the closing of anchor stores has been going on for a while. We believe there's only a couple of places in the mall that people will line up for products. One of them is a Foot Locker family store....

58.    On September 7, 2016, Foot Locker filed its Quarterly Report on Form 10-Q with the SEC reiterating the income and earnings figures contained in the Q2 2016 Press Release (the "Q2 2016 Form 10-Q"). Defendant Peters signed the Q2 2016 Form 10-Q. The Q2 2016 Form 10-Q touted the Company's "brand equity" that aided an increase in "its portfolio of complementary retail store formats." The Q2 2016 Form 10-Q stated:

The Foot Locker brand is one of the most widely recognized names in the markets in which the Company operates, epitomizing premium quality for the active lifestyle customer. ***This brand equity has aided the Company's ability to successfully develop and increase its portfolio of complementary retail store formats, such as Lady Foot Locker, and Kids Foot Locker***, as well as Footlocker.com, its direct-to-customer business*.* Through various marketing channels, including broadcast, digital, social, print, and various sports sponsorships and events, the Company reinforces its image with a consistent message — namely, that it is the destination for athletically inspired shoes and apparel with a wide selection of merchandise in a full-service environment.

59.    The Q2 2016 Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Johnson and Peters, in their capacities as Foot Locker's CEO and CFO, respectively, which certified that the Q2 2016 Form 10-Q fully complied with Rules 13a-14(a) or 15d-14(a) of the Exchange Act. Defendants Johnson and Peters certified that the Q2 2016 Form 10-Q did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Defendants Johnson and Peters also certified that "the financial statements, and other financial information included in [the Q2 2016 Form 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

60.    On November 18, 2016, Foot Locker issued a press release reporting the Company's financial and operating results for the third quarter ended October 29, 2016 (the "Q3 2016 Press Release").  For the third quarter of 2016, Foot Locker reported net income of $157 million, or $1.17 per share, compared with net income of $80 million, or $0.57 per share, for the same quarter in 2015.  The Company stated third quarter comparable-store sales increased 4.7%. Total sales increased 5.1%, to $1.8 billion in 2016, compared with sales of $1.7 billion for the corresponding prior-year period.  EPS increased 13% to $1.13 per share over the quarter compared to EPS of $1 per share in the comparable period in 2015.  Defendant Johnson touted the Company's supposed sales and profit growth, stating:

> ***Our outstanding track record of meaningful sales and profit growth over several years is a strong testament to Foot Locker, Inc.'s solid position at the center of sneaker culture.***
>
> \* \* \*
>
> Our associates work hard every day to make our Company the sneaker lover's preferred destination for the best footwear and apparel assortments across our array of outstanding athletic vendors.  That work translated once again into an exceptional quarterly sales and profit performance.

61.    In the Q3 2016 Press Release, defendant Peters also boasted about the Company's growth, stating:

> The Company continued to execute its strategic initiatives and produce excellent financial results in the quarter, ***with solid, consistent top-line growth***, as well as incremental improvements in both gross margin and SG&A rates.  Our inventory is fresh and well-positioned as we prepare for the important holiday selling season, and we remain well on track to achieve our annual guidance of a mid-single digit comparable-store sales gain and double-digit earnings per share growth.

62.    That same day, on November 18, 2016, the Company held an earnings conference call for analysts and investors.  During the conference call, Company fiduciaries issued statements on behalf of the Company regarding its financial and operational prospects.

Defendant Peters assured analysts that "[u]nlike a lot of retail, our store traffic in the U.S. was up and our comparable sales in the store segment were up mid single digits."

63.     On December 7, 2016, Foot Locker filed its Quarterly Report on Form 10-Q with the SEC reiterating the income and earnings figures contained in the Q3 2016 Press Release (the "Q3 2016 Form 10-Q"). Defendant Peters signed the Q3 2016 Form 10-Q. The Q3 2016 Form 10-Q touted the Company's "brand equity" that aided an increase in "its portfolio of complementary retail store formats." The Q3 2016 Form 10-Q stated:

> The Foot Locker brand is one of the most widely recognized names in the markets in which the Company operates, epitomizing premium quality for the active lifestyle customer. ***This brand equity has aided the Company's ability to successfully develop and increase its portfolio of complementary retail store formats, such as Lady Foot Locker, and Kids Foot Locker***, as well as Footlocker.com, its direct-to-customer business. Through various marketing channels, including broadcast, digital, social, print, and various sports sponsorships and events, the Company reinforces its image with a consistent message — namely, that it is the destination for athletically inspired shoes and apparel with a wide selection of merchandise in a full-service environment.

64.     The Q3 2016 Form 10-Q contained signed SOX certifications by defendants Johnson and Peters, in their capacities as Foot Locker's CEO and CFO, respectively, which certified that the Q3 2016 Form 10-Q fully complied with Rules 13a-14(a) or 15d-14(a) of the Exchange Act. Defendants Johnson and Peters certified that the Q3 2016 Form 10-Q did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Defendants Johnson and Peters also certified that "the financial statements, and other financial information included in [the Q3 2016 Form 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

65.     On February 24, 2017, Foot Locker issued a press release reporting the Company's financial and operating results for the fourth quarter and fiscal year ended January 28, 2017 (the "FY 2016 Press Release").  For the fourth quarter of 2016, Foot Locker reported net income of $189 million, or $1.42 per share, compared with net income of $158 million, or $1.14 per share, for the same quarter in 2015.  The Company stated fourth quarter comparable-store sales increased 5%.  Total sales increased 5.3%, to $2.1 billion for 2016, compared with sales of $2 billion for the corresponding prior-year period.  Defendant Johnson affirmed that the Company's strategic initiatives put Foot Locker in a "solid position at the center of sneaker culture," stating:

> Generating our seventh consecutive year of meaningful sales and profit growth is a strong testament to Foot Locker, Inc.'s solid position at the center of sneaker culture.
>
> * * *
>
> All credit goes to the incredibly talented team of associates we have around the world, and I want to thank them sincerely for another outstanding performance in 2016.  Due in part to the change in the cadence of income tax refund check distribution, we are facing a challenging retail sales environment as we enter 2017; however, we believe the strategic initiatives we have in place, coupled with our strong vendor relationships, will enable us to deliver another year of record performance.

66.     In the FY 2016 Press Release, defendant Peters claimed that the Company planned "for a mid-single digit comparable sales gain and a double-digit" EPS increase, stating:

> We continued to make substantial progress in 2016 towards our long-term goals.
>
> * * *
>
> Our Earnings Before Interest and Taxes surpassed $1 billion for the first time in our history and the EBIT rate improved to 13 percent of sales.  Our adjusted net income margin increased to 8.4 percent and our sales per gross square foot reached $515.  Although we currently face a softer sales environment than at this time last year, we are planning for a mid-single digit comparable sales gain and a double-digit earnings per share increase for the full year of 2017.

67.     Also on February 24, 2017, the Company held an earnings conference call for analysts and investors.  During the conference call, Company fiduciaries issued statements on behalf of the Company regarding its financial and operational prospects.  Defendant Johnson touted the strength of its retail operations in spite of an overall market downturn, including opening retail destinations, stating:

> The opening of our flagship store on 34th street in August really energized many of our customers, as has the grand opening of The Foot Locker in Times Square earlier this month.  It's great to see the excitement that these pinnacle retail destinations generate for our brand.  As Lauren [Peters] mentioned, we also have reopened the key store in Sydney this month, and have similar openings coming up in Chicago, Los Angeles, Toronto, and Melbourne later this year.  In other words, we're cultivating that strong connection with sneaker culture in major markets, not just in the US, but in many of our key cities around the world.

68.     On March 23, 2017, Foot Locker filed its Annual Report on Form 10-K with the SEC reiterating the income and earnings figures contained in the FY 2016 Press Release (the "2016 Form 10-K").  Defendants Johnson, Peters, Clark, DiPaolo, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young signed the 2016 Form 10-K.  The 2016 Form 10-K touted the Company's "brand equity" that aided an increase in "its portfolio of complementary retail store formats."  The 2016 Form 10-K stated:

> The Foot Locker brand is one of the most widely recognized names in the markets in which we operate, epitomizing premium quality for the active lifestyle customer. ***This brand equity has aided our ability to successfully develop and increase our portfolio of complementary retail store formats, such as Lady Foot Locker and Kids Foot Locker, as well as Footlocker.com,*** its direct-to-customer business.  Through various marketing channels and experiences, including social, digital, broadcast, and print media, as well as various sports sponsorships and events, we reinforce our image with a consistent message — namely, that we are the destination for athletically inspired shoes and apparel with a wide selection of merchandise in a full-service environment.

69.     The 2016 Form 10-K contained signed SOX certifications by defendants Johnson and Peters, in their capacities as Foot Locker's CEO and CFO, respectively, which certified that the 2016 Form 10-K fully complied with Rules 13a-14(a) or 15d-14(a) of the Exchange Act.

Defendants Johnson and Peters certified that the 2016 Form 10-K did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Defendants Johnson and Peters also certified that "the financial statements, and other financial information included in [the 2016 Form 10-K], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

## THE FALSE AND MISLEADING 2017 PROXY

70.     On April 7, 2017, defendants Johnson, Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young caused Foot Locker to file with the SEC its 2017 Proxy in connection with the 2017 Annual Meeting of Shareholders, held on May 17, 2017. Defendants Johnson, Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young negligently issued materially misleading statements with respect to these solicited votes. Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

**Material Misstatements in Support of Reelecting Defendants Johnson, Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young**

71.     In the 2017 Proxy, defendants Johnson, Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young solicited votes to reelect themselves. In support of their bid to reelect themselves, defendants Johnson, Clark, Feldman, Gilbert,

Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young highlighted their supposed successful oversight of the Company. The 2017 Proxy incorrectly claimed that: (i) the Board was engaged in active risk oversight of the Company, including focusing on the risk in the Company's operations; (ii) the Audit Committee exercised oversight of the financial statements; and (iii) Foot Locker's financial statements were accurate, and therefore appropriate for the Board's approval in the Company's Annual Report.

72.     In terms of the Board's oversight of risk, the 2017 Proxy stated on page 13:

**Risk Oversight**

The Board has oversight responsibilities regarding risks that could affect the Company. This oversight is conducted primarily through the Audit Committee. The Audit Committee has established procedures for reviewing the Company's risks. These procedures include regular risk monitoring by management to update current risks and identify potential new and emerging risks, quarterly risk reviews by management with the Audit Committee, and an annual risk report to the full Board. The Audit Committee Chair reports on the committee's meetings, considerations, and actions to the full Board at the next Board meeting following each committee meeting. In addition, the Compensation Committee considers risk in relation to the Company's compensation policies and practices. The Compensation Committee's independent compensation consultant provides an annual report to the committee on risk relative to the Company's compensation programs.

The Company believes that this process for risk oversight is appropriate in light of the Company's business, size, and active senior management participation, including by the Chief Executive Officer, in managing risk and holding regular discussions on risk with the Audit Committee, the Compensation Committee, and the Board.

73.     The 2017 Proxy also claimed that the Audit Committee exercised oversight over the Company's financial statements and reporting process. The 2017 Proxy stated on pages 80:

**Audit Committee Report**

In accordance with the charter adopted by the Board, the Audit Committee assists the Board in fulfilling its oversight responsibilities in the areas of the Company's accounting policies and practices and financial reporting. The Audit Committee has responsibility for appointing the independent registered public accounting

firm. The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting.

The Audit Committee consists of five independent directors, as independence is defined under the NYSE rules. All of the Audit Committee members meet the expertise requirements under the NYSE rules.

The Audit Committee held nine meetings in 2016. At its meetings during 2016, the Audit Committee discussed with management, the Company's independent registered public accounting firm (KPMG LLP), and the Company's internal auditors the assessment of the Company's internal control over financial reporting. The Audit Committee also discussed with KPMG its attestation report and opinion on the Company's internal control over financial reporting contained in the 2016 Annual Report on Form 10-K. The Audit Committee also regularly meets privately with KPMG during the year.

The Audit Committee reviewed and discussed with management and KPMG the audited financial statements for the 2016 fiscal year, which ended January 28, 2017. The Audit Committee also discussed with KPMG the matters required to be discussed by applicable Public Company Accounting Oversight Board (the "PCAOB") standards. The Audit Committee, both with and without management present, discussed and reviewed the results of KPMG's examination of the financial statements and the overall quality of the Company's financial reporting.

The Audit Committee obtained from KPMG the written disclosures and the letter required by applicable requirements of the PCAOB regarding the independent accountant's communications with the Audit Committee concerning independence, and has discussed with KPMG its independence and any relationships that may affect its objectivity. The Audit Committee also considered whether the non-audit services provided by KPMG to the Company are compatible with maintaining KPMG's independence. The Audit Committee has satisfied itself that KPMG is independent.

***Based on the review and discussions referred to above, the Audit Committee recommended to the Board that the audited financial statements be included in the 2016 Annual Report on Form 10-K.***

74.    Through these statements, defendants Johnson, Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young misleadingly claimed that the Board: (i) maintained sufficient compliance, internal control, review, and reporting programs to identify and address misconduct; (ii) was unaware of existing material risks that could affect the Company; and (iii) maintained risk management practices. In reality, the Board and Audit

Committee did not exercise active and appropriate oversight over the Company's corporate governance, risk management, and financial statements.   Rather, these Board members continually failed to address the Company's retail store portfolio was contracting instead of increasing and Foot Locker was closing its brick-and-mortar stores.  The Company was reporting inflated revenues and earnings as a result, and therefore its financial statements were not appropriate to include in the Company's SEC filings.  Defendants Johnson, Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young were negligent in including these misleading statements in the 2017 Proxy.

75.    Defendants Johnson, Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young made these material misrepresentations above in the 2017 Proxy in support of a stockholder vote for reelecting themselves to the Board.   Numerous stockholders voted in favor of their reelection based on material misrepresentations about the Company's supposed risk management and internal controls over its financial reporting.  This harmed stockholders by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  Therefore, the 2017 Proxy solicitation was an "essential link" in the accomplishment of the harm-causing conduct.

**Material Misstatements in Support of a Vote to Approve an Amendment to the Incentive Plan**

76.    Defendants Johnson, Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young also made material misrepresentations in the 2017 Proxy in support of a stockholder vote for approval of an amendment to the Incentive Plan "to increase the maximum bonus payout to any Covered Employee for any plan year from $3 million to $6 million."   Subject to meeting performance goals achieved, defendant Johnson stood to receive a payout at maximum under the Incentive Plan of $3.3 million.

77.     The stated purpose of the Incentive Plan was to "reinforce corporate, organizational, and business development goals; to promote the achievement of year-to-year financial and other business objectives; [and] to reward the performance of individual officers and other employees in fulfilling their personal responsibilities for year-to-year achievements." The compensation awards were subject to performance goals, including target levels or percentage increase in profits, cash flows, returns on invested capital or investment, EPS from continuing operations, revenues, net income, or earnings before interest, taxes, depreciation, and amortization.

78.     The material terms of the performance goals in Foot Locker's Incentive Plan did not encourage proper risk oversight, nor advanced long-term stockholder value.  In reality, the material terms of the performance goals in the Incentive Plan actually encouraged—and consistently rewarded—extreme risk-taking and widespread illegal practices described herein, which furthered only short-term growth fueled by artificially inflated revenues and earnings while rewarding executives overseeing such endeavors.

79.     Under this false impression, numerous Foot Locker stockholders voted for the increase in shares for distribution under the Incentive Plan.  This vote was made without the benefit of material information regarding the defendants' continued and ongoing failure to address Company's contracting retail store portfolio and brick-and-mortar store closings.   In reality, the Incentive Plan only incentivized the continued risk-taking, illegal, and loss-generating corporate action described herein.  The proxy solicitation for a stockholder vote on the material terms of the performance goals in Foot Locker's Incentive Plan directly authorized harm to the stockholders.  Therefore, the 2017 Proxy was an "essential link" in the accomplishment of the harm-causing conduct.

- 32 -

## THE TRUTH SLOWLY EMERGES

80.     On May 19, 2017, Foot Locker issued a press release announcing the Company's financial and operating results for the first quarter ended April 29, 2017.  Defendant Johnson admitted that the Company's financial position fell "short of our original expectations."  For the first quarter of 2017, the Company reported that its revenue had stagnated.  In particular, comparable-store sales only increased 0.5%, making net income $180 million, or $1.36 per share, compared with net income of $191 million, or $1.39 per share in the same period of 2016.

81.     In an earnings conference call held for analysts and investors that same day, Foot Locker further disclosed comparable-store sales in Foot Locker's stores declined 1.2%.  The Company revealed that profits were relatively flat compared to the second quarter of 2016. Defendant Johnson reported that without improved sales, Foot Locker would need to cut costs and inventory to meet its 2017 financial guidance that provided for a modest mid-single digit EPS increase.

82.     On this disappointing news, Foot Locker's stock plunged more than 16%, or $11.73 per share, on May 19, 2017, to close at $58.72 per share compared to the previous trading day's closing of $70.45 per share, erasing almost $1.54 billion in market capitalization in a single day.

83.     The full extent of Foot Locker's inability to meet its financial guidance came to light on August 18, 2017.  On that day, the Company issued a press release announcing its financial and operating results for the second quarter ended July 29, 2017.  For the second quarter of 2017, Foot Locker announced that total sales had declined 4.4% year-over-year, declining $80 million from $1.78 billion to $1.7 billion for the corresponding prior-year period. Meanwhile, comparable-store sales decreased a total of 6%.    Correspondingly, profits

plummeted to a mere $51 million, or $0.39 per share, well below the $0.90 per share the Company led the public to expect. Profits for the second quarter of 2017 were also well below the $127 million, or $0.94 per share reported in the same quarter for 2016.

84.     Contrary to the Individual Defendants' prior assertions that Foot Locker was increasing its portfolio of retail stores, the Company also reported that it was closing approximately 130 stores. During an earnings conference call held for analysts and investors that same day, the Company likewise reported that it expected weak sales for the remainder of fiscal year 2017. Particularly, defendant Johnson estimated that the Company's "current top line [revenue] estimate for the second half of the year is for a comparable sales loss in the 3% to 4% range" for the third and fourth quarters. He noted that "[l]ooking ahead, we expect some of the trends of the second quarter to persist through the remainder of the year."

85.     The Company's stock price dropped off dramatically in the wake of this news, falling almost 28% on August 18, 2017. In particular, Foot Locker's stock fell $13.32 per share, closing at $34.38 per share on August 18, 2017, compared to $47.70 per share the previous day, erasing over $1.74 billion in market capitalization in a single day.

86.     Overall, market capitalization plummeted $5.96 billion during this period, or almost 57%, from an artificially high price of $79.20 per share on December 8, 2016 to $34.38 per share on August 18, 2017, slashing the Company's price by more than half.

87.     Analysts, surprised by this sudden shift, altered their outlook for Foot Locker in the face of the Company's slowing sales at brick-and-mortar retail stores. By August 2017, UBS analyst Michael Binetti and others had downgraded Foot Locker, noting the inevitability of the Company's market share loss to online retailers. "For Foot Locker, ... will have to significantly accelerate closure of its lower-tier stores to properly absorb market share shift" to online retailers

like Amazon, UBS warned.  Similarly, analysts at J.P. Morgan downgraded Foot Locker's rating and price target from $54 to $37 per share.

## REASONS THE STATEMENTS WERE IMPROPER

88.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that:

(a)    they lacked a reasonable basis for positive statements regarding the Company's business and financial prospects;

(b)    the Company's retail store portfolio was contracting instead of increasing;

(c)    Foot Locker's vendors were expanding to online retailers as opposed to brick-and-mortar stores, compromising the Company's long-touted exclusive relationships with vendors;

(d)    pricing competition with online retailers decreased demand for brick-and-mortar, mall-centric stores;

(e)    the Company failed to maintain adequate disclosure controls and procedures with respect to Foot Locker's operations and financial standing; and

(f)    as a result of the foregoing, the officers' and directors' representations concerning the Company's business, prospects, and financial standing were improper.

## DAMAGES TO FOOT LOCKER

89.    As a result of the Individual Defendants' improprieties, Foot Locker disseminated improper, public statements that omitted or failed to disclose that the Company faced substantial headwinds in its comparable retail store sales affecting its revenues and earnings guidance.  Foot Locker is the subject of securities class actions lawsuits as a result.  These improper statements

have devastated Foot Locker's credibility as reflected by the Company's almost $6 billion, or 57%, market capitalization loss.

90.    Foot Locker's scheme to conceal material, adverse information from the investing public also damaged its reputation within the business community and in the capital markets. In addition to price, Foot Locker's current and potential customers consider a company's trustworthiness, stability, and ability to accurately describe its business operations. Foot Locker's ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

91.    Further, as a direct and proximate result of the Individual Defendants' actions, Foot Locker has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)    costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws, plus potentially hundreds of millions of dollars in settlement, or to satisfy an adverse judgment;

(b)    costs incurred to investigate the wrongdoing internally; and

(c)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Foot Locker.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

92.    Plaintiff brings this action derivatively in the right and for the benefit of Foot Locker to redress injuries suffered, and to be suffered, by Foot Locker as a direct result of violations of securities law, breach of fiduciary duty, waste of corporate assets, and unjust

enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Foot Locker is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

93.    Plaintiff will adequately and fairly represent the interests of Foot Locker in enforcing and prosecuting its rights.

94.    Plaintiff was a stockholder of Foot Locker at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Foot Locker stockholder.

95.    The current Board of Foot Locker consists of the following eleven individuals: defendants Johnson, Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Johnson, Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young Face a Substantial Likelihood of Liability for Their Misconduct**

96.    As alleged above, defendants Johnson, Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young breached their fiduciary duties of loyalty by making improper statements in Foot Locker's press releases and SEC filings on behalf of the Company regarding Foot Locker's business practices, operations, financials, financial prospects, and disclosure controls and procedures were truthful, accurate, and complete.

97.    Defendants Johnson, Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young were responsible for reviewing and approving the Company's financial statements. These defendants authorized false financial and public statements during the relevant period, as alleged herein, as well as failed to correct other statements the Officer Defendants made during the relevant period. Accordingly, defendants

Johnson, Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young were active participants in breaches of good faith, candor, and loyalty, and have subjected the Company to class action lawsuits claiming violations of the federal securities laws. Defendants Johnson, Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young caused and/or allowed the Company to engage in the unlawful conduct alleged herein, and these defendants face a substantial likelihood of liability. As a result, any demand upon defendants Johnson, Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young to bring suit against themselves or the Officer Defendants would be a useless and futile act.

98.    Defendants Johnson, Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young are responsible for negligently made statements in the materially misleading 2017 Proxy. It is against public policy to indemnify individuals for violations of section 14(a) of the Exchange Act. Accordingly, an indemnification provided by the Company to defendants Johnson, Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young does not protect them for violation of section 14(a) in the 2017 Proxy. Accordingly, defendants Johnson, Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young face substantial likelihood of liability, excusing demand.

99.    Defendants Clark, Gilbert, Marmol, McKenna, Payne, and Young as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance. The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements. Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to Foot Locker's earnings

guidance and financial and disclosure controls.  Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public.  Despite their knowledge or reckless disregard, the Audit Committee Defendants caused or allowed these improper statements.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, defendants Clark, Gilbert, Marmol, McKenna, Payne, and Young face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

100.    Defendants Clark, Feldman, Marmol, McKenna, and Underhill, as members of the Finance and Strategic Planning Committee, reviewed and approved "the overall strategic and financial plans of the Company, including capital expenditure plans" and "acquisition and divestiture proposals."  The Finance and Strategic Planning Committee's Charter requires the Finance and Strategic Planning Committee Defendants to review the financial plans and make "recommendations to the Board of Directors with regard to the Company's annual operating budget and three-year plans."  Despite their knowledge or reckless disregard of the closing of brick-and-mortar retail stores and shrinking comparable store sales, the Finance and Strategic Planning Committee Defendants caused or allowed these improper statements.  Accordingly, the Finance and Strategic Planning Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, defendants Clark, Feldman, Marmol, McKenna, and Underhill face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

**Demand Is Excused as to Defendant Johnson Because He Lacks Independence**

101.    The principal professional occupation of defendant Johnson is his employment with Foot Locker, pursuant to which he has received and continues to receive substantial

monetary compensation and other benefits as alleged above. Accordingly, defendant Johnson lacks independence from defendants Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young due to his interest in maintaining his executive position at Foot Locker. This lack of independence renders defendant Johnson incapable of impartially considering a demand to commence and vigorously prosecute this action. Foot Locker paid defendant Johnson the following compensation:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compen-sation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compen-sation | Total |
|------|--------|--------------|---------------|------------------------------------------|--------------------------------------------------------------------------|-------------------------|-------|
| 2017 | $1,100,000 | $2,750,061 | $2,200,005 | | $294,161 | $48,995 | $6,393,222 |
| 2016 | $1,087,500 | $2,062,522 | $2,200,016 | $2,599,932 | $403,443 | $572,455 | $8,925,868 |

102.    Plaintiff has not made any demand on the other stockholders of Foot Locker to institute this action since such demand would be futile and useless act for at least the following reasons:

(a)    Foot Locker is a publicly held company with over 118.1 million shares outstanding and thousands of stockholders as of March 26, 2018;

(b)    making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)    making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

**Against Defendants Johnson, Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young for Violation of Section 14(a) of the Exchange Act**

103.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

104.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of defendants Johnson, Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young.  The section 14(a) claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

105.    Defendants Johnson, Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young negligently issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to stockholders that were contained in the 2017 Proxy.   The 2017 Proxy contained proposals to the Company's stockholders that they vote to reelect the members of the Board and approve the amendment of the Incentive Plan to increase the maximum bonus payout to certain executives including defendant Johnson for any plan year from $3 million to $6 million under the plan.  By reasons of the conduct alleged herein, defendants Johnson, Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young violated section 14(a) of the Exchange Act.  As a direct and proximate result of these violations, stockholders voted in favor of reelecting defendants Johnson, Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young to the Board and the increase in bonus payments available under the

Incentive Plan. Defendants Johnson, Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young's reelection and the incentives approved under the Incentive Plan led to the continuation of the wrongful practices described herein.

106. Plaintiff, on behalf of Foot Locker, thereby seeks relief for damages inflicted upon the Company in connection with the improper election of defendants Johnson, Clark, Feldman, Gilbert, Marmol, McKenna, Oakland, Payne, Turpin, Underhill, and Young based upon the false and misleading 2017 Proxy, and also seeks new director elections on the basis of a special proxy with appropriate corrective disclosures.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

107. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

108. The Individual Defendants owed and owe Foot Locker fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Foot Locker the highest obligation of good faith, fair dealing, loyalty, and due care.

109. The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty. More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Foot Locker, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

110. The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration. The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that: (i) they

lacked a reasonable basis for positive statements regarding the Company's business and financial prospects; (ii) the Company's retail store portfolio was contracting instead of increasing; (iii) Foot Locker's vendors were expanding to online retailers as opposed to brick-and-mortar stores, compromising the Company's long-touted exclusive relationships with vendors; (iv) pricing competition with online retailers decreased demand for brick-and-mortar, mall-centric stores; and (v) the Company failed to maintain adequate disclosure controls and procedures with respect to Foot Locker's operations and financial standing.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

111.    The Director Defendants owed Foot Locker the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper statements.  The Director Defendants knew or were reckless in not knowing that: (i) they lacked a reasonable basis for positive statements regarding the Company's business and financial prospects; (ii) the Company's retail store portfolio was contracting instead of increasing; (iii) Foot Locker's vendors were expanding to online retailers as opposed to brick-and-mortar stores, compromising the Company's long-touted exclusive relationships with vendors; (iv) pricing competition with online retailers decreased demand for brick-and-mortar, mall-centric stores; and (v) the Company failed to maintain adequate disclosure controls and procedures with respect to Foot Locker's operations and financial standing.  Accordingly, the Director Defendants breached their duty of loyalty to the Company.

112.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of

oversight and to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

113.    The Finance and Strategic Planning Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Finance and Strategic Planning Committee, which they knew or were reckless in causing or allowing improper statements and omissions despite having access to financial and operational information indicating the closing of brick-and-mortar retail stores and slowing comparable store sales. The Finance and Strategic Planning Committee Defendants completely and utterly failed in their duty of oversight and failed in their duty to appropriately review financial results, as required by the Finance and Strategic Planning Committee Charter in effect at the time.

114.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Foot Locker has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

115.    Plaintiff, on behalf of Foot Locker, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

116.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Foot Locker's disclosure controls and procedures, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in this improper course of conduct,

which was continuous, connected, and ongoing throughout the relevant period. It resulted in continuous, connected, and ongoing harm to the Company.

118.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) paying excessive compensation and bonuses to certain of its executive officers; and (ii) incurring potentially hundreds of millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions, including defending the Company and its officers against the securities class action lawsuits.

119.    As a direct and proximate result of these defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein. As a result of their waste of corporate assets, the Individual Defendants are liable to the Company.

120.    Plaintiff, on behalf of Foot Locker, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

121.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

122.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Foot Locker. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Foot Locker.

123.    Plaintiff, as a stockholder and representative of Foot Locker, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

124.    Plaintiff, on behalf of Foot Locker, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of Foot Locker, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violation of securities law, breach of fiduciary duty, waste of corporate assets, and unjust enrichment;

B.    Directing Foot Locker to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Foot Locker and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

1.    a proposal to strengthen Foot Locker's oversight of its disclosure procedures;

2.    a proposal to strengthen the Company's controls over financial reporting;

3.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

4.    a provision to permit the stockholders of Foot Locker to nominate at least three candidates for election to the Board.

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a

constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Foot Locker has an effective remedy;

D.      Awarding to Foot Locker restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: May 15, 2018                          LAW OFFICES OF THOMAS G. AMON

                                              THOMAS G. AMON

                                              733 3rd Avenue, 15th Floor
                                              New York, NY 10017
                                              Telephone: (212) 810-2430
                                              E-mail: tamon@amonlaw.com

                                              ROBBINS ARROYO LLP
                                              BRIAN J. ROBBINS
                                              GEORGE C. AGUILAR
                                              LINDSEY C. HERZIK
                                              600 B Street, Suite 1900
                                              San Diego, CA 92101
                                              Telephone: (619) 525-3990
                                              Facsimile: (619) 525-3991
                                              E-mail: brobbins@robbinsarroyo.com
                                                       gaguilar@robbinsarroyo.com
                                                       lherzik@robbinsarroyo.com

RM LAW, P.C.
RICHARD A. MANISKAS
1055 Westlakes Drive, Suite 300
Berwyn, PA 19312
Telephone: (484) 324-6800
Facsimile: (484) 631-1305
E-mail: rmaniskas@rmclasslaw.com

Attorneys for Plaintiff

1254598

- 48 -

VERIFICATION

I, Vladimir Gusinsky, hereby declare as follows:

I am the trustee for the Vladimir Gusinsky Revocable Trust, the plaintiff in the within entitled action. I have read the Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:___05/15/18_____

_____
VLADIMIR GUSINSKY, TRUSTEE